JOHN B. THOMPSON

v.

PENNSYLVANIA RAILROAD COMPANY.

1. Proceedings in contempt are of two classes, viz., (1) those instituted solely for the purpose of vindicating the dignity and preserving the power of the court, being criminal and punitive in their nature; and (2) those instituted by private individuals for the purpose of protecting or enforcing private rights, being remedial and civil in their nature.

2. In proceedings of the second class the state of mind toward the court of the offending party is immaterial, and it is no answer to the complaint of the injured party that the offender did not intend in what he did to contemn the authority of the court.

3. When a party has disobeyed an injunction of this court to the injury of another party, resulting in damages unliquidated in their nature and not ascertainable by the machinery of this court, it will not, in the absence of special circumstances, commit the offender until he compensate the injured party, but leave the latter to his remedy at law.

In the matter of William H. Bannard. Proceedings in contempt for breach of injunction.

*Mr. John W. Wartman* and *Mr. John J. Crandall,* for the motion.

*Mr. Samuel H. Grey, contra.*

PITNEY, V. C.

On the 3d day of December, 1889, an injunction issued out of the court directed to the defendant, its servants and agents, enjoining them to

"Absolutely desist and refrain from operating your engines in front or near the house of John B. Thompson, at the southeast corner of Bridge avenue and Fourth street, in the city of Camden, for the purpose of distributing and shifting your cars and making up trains, and from using the southernmost track in front or near to said dwelling to stand, put or place cars laden with cattle,

sheep or hogs upon, except in extraordinary emergencies it becomes unavoidable." '

On the 9th day of July, 1890, the complainant presented his petition, supported by affidavits, setting forth that one William H. Bannard was the superintendent of that part of defendant's railroad mentioned in the injunction, and had been duly served with a copy of the writ, and that it had been broken by drilling &c. in front of complainant's premises. An order was made on this petition calling on Mr. Bannard to show cause why he should not be attached for a contempt of this court on account of his breach of the injunction.

On the return of this order a day was fixed for the hearing, and both parties were fully heard by evidence taken orally.

It appeared by the evidence that as soon as the decision of the court of errors and appeals (*18 Stew. Eq. 870*), which resulted in this writ, was made known to Mr. Bannard, and before the writ actually issued, he issued orders in writing to all the employes of the company to abstain from doing the prohibited acts, and also gave oral orders to the same effect.

. With regard to the first branch of the injunction—that directed against running engines for drilling purposes in front of complainant's house—he directed all engineers in going out from the yard towards complainant's house to stop their engines before reaching Fourth street. If this order had been strictly obeyed in all instances there would have been no breach of the injunction. But, in point of fact, it was not in every instance observed, and in many instances between the issuing of the injunction and the filing of the petition, and again since that time, engines going out from the round-house and yard, either with cars behind them to be backed into the station, or alone to be backed down in front of passenger trains, have passed Fourth street and the front of complainant's house.

Was this forbidden by the injunction ? I think it was. It was a use of the tracks in front of complainant's premises for terminal purposes—distributing and shifting cars and making up trains.

Mr. Bannard denied all intention to violate or disregard the injunction, and I am satisfied he intended in good faith to obey it.    And it is proper to add that though I have felt constrained to find that the injunction has been thus disobeyed in many instances, yet it is quite true, as urged by defendant's counsel, that in the very great majority of the movements of engines of the character mentioned, amounting to several hundred each day, they did stop at Fourth street and no breach occurred.

Upon this case counsel for Mr. Bannard made several points— *first,* that the exception of " extraordinary emergencies " &c. applies to both branches of the injunction, as well that against drilling as that against the standing of trains loaded with live animals in front of complainant's premises ; *second,* that the burden is on the complainant to show that the comparatively few breaches proven in the case were not justified by the exception before referred to ; *third,* that the superintendent can only be punished for a willful and intentional breach of the injunction, and that the element of intent is wanting here.

With regard to the first point.    Upon a simple reading of the writ, and a consideration of the subject-matter, I should have thought that the exculpatory clause was intended to apply only to the last branch of the injunction ; but by reference to the opinion of the court of appeals in *Angel* v. *Railroad, 14 Stew. Eq. 316,* which formed the precedent for this case, I find (at *p. 331*) that the court intended that the exception should extend to both branches of the injunction ; and as the language used is capable of being so construed, I will so consider it.

As to the second point.    It seems to me that Mr. Bannard is clearly wrong upon the plainest principles of construction, the general rule being, that he who seeks the benefit of an exception of this sort must prove himself within it.    And here, again, a reference to the opinion just cited shows that the court intended that the burden should be thrown on the railroad company of showing that the forbidden act was excused by the special circumstances.    Says the learned justice : " The injunction should be against the use of those tracks, for the purposes indicated, in the transaction of the ordinary business of the defendant, leaving

it at liberty to show, in response to any attempt to punish it for violation, that an occasional use was necessitated by an unforeseen contingency."

The third point opens a wider field for discussion. Proceedings in contempt are of two classes, namely, *first*, those instituted solely for the purpose of vindicating the dignity and preserving the power of the court. These are criminal and punitive in their nature, and are usually instituted by the court in the interest of the general public and not of any particular individual or suitor. *Second*, those instituted by private individuals for the purpose, mainly, if not wholly, of protecting or enforcing private rights, and in which the public have no special interest. These are remedial or civil in their nature rather than criminal or punitive. *Dodd* v. *Una, 13 Stew. Eq. 672* (at *p. 714*), *per* Depue, J.; *People* v. *Oyer and Terminer, 101 N. Y. 245*; *Rap. Contempt* § *21.* At the same time the contempt, which is the foundation of this latter class of proceedings, may be of such a character as to induce the court to deal with it as a matter affecting the dignity and power of the court as well as an infringement of a private right.

The proceeding here belongs to the second class, and the question is, whether in such a case the court is warranted in taking any action *in personam*, in the absence of a willful intention to contemn its dignity and authority and to disregard its order. I think, upon principle, that the answer must be in the affirmative, provided, of course, the person acting contrary to the order of the court, or failing to act in accordance therewith, as the case may be, is conscious of the quality of his act or non-action in that respect. For instance, if A be ordered to pay a sum of money to B, and, being able so to do, fails to make the payment, of what consequence is it to B what may have been the motive which induced the failure, or what may have been the state of A's mind toward the court? And if B brings the breach of its order to the attention of the court, and asks that its process do issue against A therefor, must his application be refused if A can satisfy the court that he entertained no disregard for the court, and did not mean to set its order at defiance? So in the case of a nuisance: if A be enjoined from so using a dam on his land as to

flood B's land, and fails to observe the injunction, and B's land is flooded thereby, in any and all such cases, it seems to me that it is no answer to the complaint of the injured party to say that the party inflicting the injury meant no disrespect to the court. The injury suffered by the complaining party is neither increased nor diminished, nor in any way affected by the state of mind towards the court of the party inflicting the injury; and the breach of the injunction consists in doing the forbidden thing, and not in the intention with which it is done.

It seems to me that this result follows necessarily upon the classification of these proceedings before mentioned, and an examination of the cases shows that such has been the rule practically, though in many cases tacitly, observed by the courts.

In *Quackenbush* v. *Van Riper, 2 Gr. Ch. 350*, an *interim* injunction against flooding land by a dam had been issued and disobeyed. Cross-motions to dissolve the injunction and to attach for contempt were made, and both were granted, although the chancellor was satisfied (*p. 356*) that there was no intention to violate the injunction. Yet he ordered the parties, in what may be called technical contempt, to pay the costs of the application, and refused them costs on the motion to dissolve.

Attachments for contempt for not obeying the consent rule in ejectment, and not performing an award on a submission by a rule of court, furnish illustrations of the same practice. *McClure* v. *Gulick, 2 Harr. 340; The State* v. *Gulick, 2 Harr. 435; Den.* v. *Hendrickson, 3 Harr. 366.*

A case more in point is *Spokes* v. *The Banbury Board of Health, L. R. (1 Eq. Cas.) 42, 11 Jur. (N. S.) 1010.* The defendants there had been enjoined from permitting sewage to pass into the river Chirwell to the injury of the plaintiff's mill, and a motion was made for a sequestration against them. The answer was, that the defendants had found it almost impossible to obey the injunction literally, and had been trying to find means of rendering the sewage innocuous, and that they did not intend to treat the order of the court with contempt. But Vice-Chancellor Wood (afterwards Lord Hatherley) refused (*1 Eq. Cas. 48*) to consider the defence, held the intent of the defendants immaterial,

and ordered the writ to issue, and his action was affirmed on appeal by Lord-Justices Knight-Bruce and Turner. *11 Jur.* (*N. S.*) *1011.* In delivering judgment Lord-Justice Knight-Bruce said that the writ was a matter of course, due to the plaintiff by the law of the country, as the means of enforcing the order. And Lord-Justice Turner said : " The defendants say that there has been no willful breach of the order. But I do not ascribe to them any willful intention of disobeying the injunction. Indeed, their action shows that there has been no purposed intention of defeating the decree of the court."

The writ of sequestration for seizing and holding all the property of the defendant, used in that case, is one of the modes, and, perhaps, the most efficient mode, of compelling a corporation to obey the order of the court, and might have been resorted to in this case instead of proceeding against the servant of the defendant. It is issued against corporations under the same circumstances, and for the same reason, that an attachment and commitment is issued against natural persons.

Mr. Bannard, the party here proceeded against, admits that he has supreme and untrammeled control—except as to the amount of money he may spend—of the Amboy division of the defendant's road, in which is included the part here in question. He had the power to absolutely prevent any breach of the injunction. He attempted to prevent it by issuing strict orders to the engineers and other employes. He might have done more. He might have stationed independent watchmen at the points in question, with power to see that his orders were obeyed, but he did not. Under these circumstances, I think it is plain that he must be held to be personally responsible for the acts of the persons who actually disobeyed the injunction. They were employed by him, and were subject to his orders and control, and their acts must, for present purposes, be held to be his acts. It would be intolerable to compel the complainant to proceed against each individual engineer who drove his engine over the forbidden ground.

No proof was offered by defendant that the breaches proven were the result of " unforeseen contingencies " or were " unavoidable " by reason of " extraordinary emergencies." On the con-

Thompson v. Pennsylvania R. R. Co.

trary, my inference from the evidence is, that they were caused—at least after the first few weeks after the issuing of the injunction—by the fact that several detached locomotives were permitted to leave the round-house in close succession, and to run out on to the siding at one time, preparatory to backing down in front of their respective trains; that they occupied so much room on the siding that the foremost engine was necessarily driven past the complainant's house in order to give room for the rear engine to pass the switch and back down to its train. It is hardly necessary to say that this was not the result of an extraordinary emergency, nor was it unavoidable.

For these reasons, I adjudge Mr. Bannard guilty of a breach of the injunction, and of a contempt of the court without any willful intention to disregard or contemn its authority or dignity.

The only remaining question is as to the remedy to be awarded to the complainant. He, by his counsel, contends, that it is the duty of the court, and within its powers and in accordance with its practice, to commit Mr. Bannard to the custody of the proper sheriff until he shall compensate the complainant in money for the damages suffered by the acts complained of.

The circumstances here do not, in my judgment, call for a definite statement of the power of the court and proper practice to be pursued in a case where a party has suffered damages by the breach of an injunction capable of liquidation in this court. I shall assume with confidence that the court has the power to commit the offending party until he shall compensate the injured party in such a case—for instance, if the party enjoined should, in breach of the writ, cut and carry away timber, the value of which is ascertainable by the machinery of this court. In the case in hand, however, the damages, if any, are unliquidated and not ascertainable except by the intervention of a jury; and for that reason, as well as those given by the chief-justice in *Palys* v. *Jewett, 5 Stew. Eq. 302*, mentioned in *Potter* v. *Brick Company, 2 Dick. Ch. Rep. 442*, I must decline to ascertain them. It may be that the court has the power, and in a proper case would exercise it, to commit the offending party until he should give security to pay such damages as a jury should award. Admitting such

power, it is enough, for present purposes, to say, that this case does not call for its exercise, the defendant being amply able to respond in damages to the plaintiff for the injury he has sustained.

Costs stand on a different basis, and have been awarded in many instances in which no other remedy or punishment was meted out. *Quackenbush* v. *Van Riper, supra; Partington* v. *Booth, 3 Meriv. 148.*

. In the case in hand the complainant was, in my judgment, fully justified in moving against Mr. Bannard, and he must have his costs. *Dias* v. *Merle, 2 Paige 494.*

In this connection I deem it proper to say, that the difficulty which the defendant encounters in transacting its business without making use of the tracks at the point in question for terminal purposes, can form no excuse for the breaches proven in this case. In March, 1886, the court of errors and appeals, in the *Angel Case*, settled the respective rights of the defendant and the abutting owners along the street in question, and the defendant had ample time thereafter to enlarge and so arrange its terminal facilities as to avoid infringing on complainant's rights.

. I will advise an order that Mr. Bannard be adjudged guilty of a contempt of the court in disobeying the injunction, and that he pay the complainant his costs, to be taxed, and a counsel fee of $100; that on failure to pay the same he be committed to the custody of the sheriff of Camden until he do pay them. The order to be without prejudice to complainant's right to bring an action at law for damages.